IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HART v. BERNHAGEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JUSTICE R. HART, APPELLEE,

V.

GABRIEL BERNHAGEN, APPELLANT.

Filed March 15, 2022.    No. A-21-574.

Appeal from the District Court for Lancaster County: HOLLY J. PARSLEY, Judge. Affirmed.

Matthew S. McKeever, of Burnett Wilson Law, L.L.P, for appellant.

Sanford J. Pollack, of Pollack & Ball, L.L.C., for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

## INTRODUCTION

Justice R. Hart was granted an ex parte domestic abuse protection order against Gabriel Bernhagen. After a show cause hearing, the district court for Lancaster County affirmed the order. Bernhagen has appealed, claiming that the district court erred by receiving certain evidence at the show cause hearing, entering and affirming the protection order against him, and failing to award him attorney fees. For the reasons set forth herein, we affirm.

## STATEMENT OF FACTS

In May 2021, Hart filed a petition and affidavit to obtain a domestic abuse protection order against Bernhagen. Apparently, she also filed a second petition and affidavit on behalf of herself and the parties' son, which, according to Bernhagen's brief on appeal, the court denied. Because Bernhagen's appeal only concerns the court's grant and continuation of the protection order in the first case and because the record on appeal does not include any documentation from the second

- 1 -

case, we do not reference the second case further. The petition and affidavit in the case on appeal referenced three separate events of alleged domestic abuse.

According to Hart's petition and affidavit, the first event, chronologically, occurred on April 24, 2021. Hart alleged that Bernhagen

> kept trying to put his hands down my pants and I repeatedly refused. I pushed him off of me and he then pushed me into the couch and bite [sic] my leg, leaving a bruise. He also pushed me off of the couch after biting me and started yelling at our son, because he was crying.

The second event occurred on May 1, 2021. Hart described this event as follows:

> [Bernhagen] choked his dog to the point where the dog wasn't breathing anymore. After that he was very aggressive - yelling at me and my son to "shut the [expletive] up" and he even shook my son when he was in his high chair. He has always tried to shake my son or yell in his face when my son would cry. He claimed that if our son wants to be annoying then he will annoy him back. My son is only a year.

As to the third event, which Hart alleged occurred on May 7 or 8, 2021, Hart stated that Bernhagen:

> was supposed to get his things between May 7th and May 8th from my house. He stole my firearms while he was there. I was staying at a friends['] when they were stolen. When I found out he took them, I became very scared, because it was the only means I can protect myself. His ex told me how extra eratic [sic] he became when she kicked him out. He stalked her, broke into the house, and threatened her. Based on his actions towards me and my son and even animals; I feared all of that and much worse. Especially since the week before he got very livid about the idea of being officially over and me dating other people. He kept yelling and throwing things.

On May 10, 2021, the district court entered an ex parte domestic abuse protection order against Bernhagen in favor of Hart. The protection order also provided that Hart was awarded temporary custody of the parties' child until August 10. After Bernhagen was served with the protection order, he requested a show cause hearing which was held on June 10.

At the show cause hearing, Hart's petition and affidavit for domestic abuse protection order were received into evidence as exhibit 1. Hart affirmed the correctness of the substance of her petition and affidavit, but clarified that the April 2021 incident actually occurred on April 25. She testified that she is asking for a protection order because she is afraid of Bernhagen, that she is afraid he will hurt her, that he has hurt her in the past, and that she believes he will hurt her again. She also testified that she is afraid for their son as a result of Bernhagen's aggression toward him.

Hart testified about the three incidents set forth in her petition and affidavit. With respect to the April 2021 incident, Hart testified that Bernhagen showed up in the middle of the night, was "very, very pushy with intercourse and stuff," but that they had consensual sexual intercourse before deciding in the morning to spend the day celebrating their son's birthday and then ending their relationship. According to Hart, they had "a decent day," but on multiple occasions when their child "would begin to be fussy," Bernhagen would raise his voice, and slapped the child's

hand once while they were eating in a restaurant. She testified that while returning from the restaurant, Bernhagen was "more irritable," became "really angry," and shook the child's car seat when the child started crying. Hart testified that in the evening, Bernhagen "wanted sex before he left" and that he "kept being really, really pushy, putting his hands in [her] shirt, trying to pull out [her] breast, tried to put his hands in [her] pants . . . rubbing against [her], all that stuff." She testified that she "kept saying, no," but that he "kept trying to force himself on [her]" although he did not "force himself" on her at that time. She also indicated that at some point that evening, Bernhagen "got really, really mad at [her]," "was trying to initiate it on the couch," and ended up "grabbing [her], throwing [her] on the couch, and biting [her] really hard on the leg, and then throwing [her] off of the couch right after." Hart also testified that the child was crying and screaming, and that before Bernhagen left, he was "really infuriated" and ended up shaking the child in his high chair, which was right next to the couch.

Hart testified, without objection, that she had evidence of the bruise on her leg from the bite and a witness who saw the bruise a few days after it was inflicted. She reviewed exhibit 20 and testified, again without objection, that it was "a Snapchat [she] had sent [Bernhagen] to show him that it still hurt" and that the bruising reflected on her leg in the exhibit was from the bite that Bernhagen inflicted on April 25, 2021. Bernhagen's attorney objected to the offer of exhibit 20 into evidence and conducted a brief voir dire examination, after which the district court sustained his foundational objection based on the lack of a time stamp or testimony as to who took the picture or when. In response to further questioning by her own attorney, Hart verified that she took the picture on April 27, sent it to Bernhagen that day via Snapchat and also saved the picture, and that it accurately reflected what her leg looked like at the time from the bite inflicted by Bernhagen on April 25. Hart's attorney reoffered exhibit 20, which was then received by the court over Bernhagen's renewed foundational objection.

Next, Hart testified about the May 1, 2021, incident when Bernhagen choked his dog. According to Hart, she showed Bernhagen their cat after it had been accidentally injured by their dogs. She testified that Bernhagen grabbed his pistol and tried to shoot one of the dogs, grabbed a second dog by the collar and held him up in the air, choking him, and attempted to get a third dog to attack the second dog. Hart testified, "And the entire time I was screaming at him to let go, but I was really afraid to go forward to him because of the fact of how erratic he was acting." She indicated that Bernhagen eventually dropped the dog, which revived, but that Bernhagen continued to be aggressive. She stated that Bernhagen again shook their child in his high chair following the dog incident, and that he also approached her, told her to "put [her] mouth on it," and when she declined he "dragged [her] by [her] hair over a lawnmower, pulled down [her] pants, and forced himself on [her] after the entire thing."

Hart also testified about the May 7 or 8, 2021, incident, when Bernhagen took her guns. According to Hart, he could have done so on either of those dates because she was away from home. She stated that she sent a text message to Bernhagen on May 7, telling him that he should "get [his] things today," and another message on May 8, telling him "I hope you got your stuff." She stated that Bernhagen took her "Ruger rifle and Ruger pistol, both .22's" and that she believed he had taken them because "he was the only one at the house that had permission" and that she "knew exactly where they were before she left."

Hart testified that her decision to file a protection order was "motivated through the fact that [Bernhagen] almost killed two dogs, shook [her] son, and forced himself on [her]," and not by the fact that he might have been "cheating" on her. She did admit, however, that she learned Bernhagen might have been cheating on her between the May 1, 2021, incident and May 10. Hart admitted that she never called the police about the April 2021 incident and had no text message or email correspondence documenting it. She testified that she did not know what to do after the incident, but that she did go to "Voices of Hope" within about a week to "figure out what to do for [her] next step, if [she] should go to the police, if [she] should get a protection order first." She testified that she allowed Bernhagen to have access to the parties' child with her supervision after the April incident, but that May 1 was the last time because "that incident was extreme, so [she] chose to do something." According to Hart, 1 or 2 days after the May 1 incident and after speaking to "Voices of Hope," she called the "National Guard Advocates," where she spoke to "a family friend" whom she felt comfortable asking what she should do next. She denied knowing at the time that the person she spoke to was Bernhagen's supervisor at the Nebraska Army National Guard where Bernhagen worked or that Bernhagen would "lose his orders, or his position, his current duty" as a result of her call.

Two other witnesses testified in support of the allegations in Hart's petition and affidavit. According to Bernhagen's half sister, Hart stayed with her on May 7 or 8, 2021, because she was afraid that Bernhagen would come to Hart's house and "harm her, or the animals, or steal stuff." She testified that Hart spoke with her about "how [Bernhagen] was going to shoot their dog" and "grabbed . . . a shotgun or something." Hart also showed her a bruise on her leg, which Hart said was caused by Bernhagen biting her. The half-sister did not recall specific details reported by Hart of how the bite occurred, but she testified that "they were playing around, and then he just became really aggressive and started dominating her, in a way." She also testified that Hart had reported being afraid of Bernhagen and had reported being hit by Bernhagen. In his testimony, Bernhagen stated that "no one in the family has a good relationship with [the half-sister] due to her mental illness" and that she had been excluded from certain recent family events.

A former friend of Bernhagen's testified that Bernhagen had told her about beating his dog. This witness also testified that Bernhagen would say "very demeaning, dismissive things" about Hart.

Bernhagen confirmed that he and Hart were in a relationship for approximately 2 years, lived together for some portion of that time, and have a son together. He denied ever attacking or trying to force himself on Hart; denied ever seeing the bruise testified to by Hart or receiving a picture of it; and denied ever shaking or hitting the parties' son or yelling at him so as to cause distress. Bernhagen also denied ever choking or shooting a dog, killing an animal, or bragging to friends about choking his dog. He explained the May 1, 2021, incident by stating that Hart told him the dogs "had killed the cats," that he grabbed one dog by his collar, "took him to the leash where [he] chained him up," and that they "couldn't even get to the other dog."

Bernhagen testified about text messages received from Hart after she found out he slept with another woman, in which she told him he was "an abuser" and she "was going to make sure" he never saw their child again. A copy of this text message, dated May 6, 2021, was received into evidence during Hart's testimony (redirect examination by Bernhagen's attorney). The text message, in addition to advising Bernhagen that his belongings were on the front lawn and that a

dog was loose and might "chew" his things, stated, "Get it within 48 hours. I'm getting an advocate through the guard and making a case against you. You're not seeing your son. You're an abuser."

Bernhagen denied stealing guns from Hart, stating that the guns referenced in her petition and affidavit had been given to him previously by Hart because "she can't properly hold firearms because of her disability with her thumbs." According to Bernhagen, the guns in question were "thrown out onto the front lawn" by Hart at the time of the second May incident. He admitted taking them at that time, as well as his shotgun that he took from the front entry of the house, and stated that he would be happy to return the guns referenced in Hart's petition and affidavit. A picture taken by Bernhagen on May 6, 2021, was received into evidence. The picture shows a jumble of items on the sidewalk in front of a building. According to Bernhagen, "a couple of cases for some firearms that were thrown outside" are visible in the picture.

Bernhagen testified that he lost his full-time job with the Nebraska Army National Guard because of the protection order. According to Bernhagen, he was told the day he received the protection order that his job "would be taken" and that he had to complete the formal termination paperwork the following day. Copies of his deployment order to Omaha and his termination order were received into evidence. The termination order specifies that the end date for Bernhagen's "TOUR" was changed from June 30, 2021, to May 14, but it does not indicate, at least in words, the reason for the change (there are various numerical codes on the document that are not explained in the record).

Bernhagen also had several witnesses who testified in support of his version of events. According to Bernhagen's mother, Hart and Bernhagen lived together for approximately 2 years, and in her conversations with the mother during that period, Hart never mentioned Bernhagen physically harming her or the parties' son. The mother testified that she saw the parties on April 25, 2021, that she did not witness any violence by Bernhagen while they were together, and that the next day no one told her about any violence by Bernhagen that might have occurred between the parties. The mother also testified about a telephone conversation in May, during which Hart said that she was upset with Bernhagen because he was seeing someone else. According to the mother, Hart did not mention fearing Bernhagen or any danger to the parties' son.

A friend of Hart's testified about a conversation with Hart at the friend's residence on May 2, 2021. During this conversation, Hart spoke to the friend about "how she was so hurt by [Bernhagen's] actions, not talking to her, and ignoring her," that "she was going to do everything to make sure that he had consequences for his actions to make sure he didn't just get away with hurting her," and that "she would reach out to the Guard to make sure that he got kicked off of orders." According to the friend, Hart did not mention anything about a protection order or being attacked or hurt physically by Bernhagen. The friend's husband was present during the May 2 conversation and he affirmed in his testimony that Hart had stated she would make sure there were "consequences for [Bernhagen's] actions" if he slept with another woman and that she was going to contact an individual who is an advocate for the Nebraska National Guard. The friend's husband also testified about participating by speaker phone in a conversation between the friend and Hart on May 6, during which Hart said that she had placed all of Bernhagen's belongings, including his guns outside, and that the husband "was free to come get what [he] want[ed]."

Bernhagen also testified about his attorney fees incurred in the case. An affidavit of attorney fees was admitted without objection.

At the conclusion of the hearing, the district court took the matter under advisement. On June 11, 2021, the court entered an order in which it modified the domestic abuse protection order issued on May 10 to remove the paragraph awarding temporary custody, but otherwise affirming the protection order and continuing it for 1 year.

## ASSIGNMENTS OF ERROR

Bernhagen asserts, consolidated, reordered, and restated, that the district court erred in (1) admitting a particular photograph into evidence without proper foundation, (2) entering and affirming the protection order against him, and (3) failing to award him attorney fees.

## STANDARD OF REVIEW

A protection order pursuant to Neb. Rev. Stat. § 42-924 (Cum. Supp. 2020) is analogous to an injunction. *Robert M. on behalf of Bella O. v. Danielle O.*, 303 Neb. 268, 928 N.W.2d 407 (2019). Thus, the grant or denial of a protection order is reviewed de novo on the record. *Id.* In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

*Admission of Evidence.*

First, Bernhagen asserts that the district court erred in admitting a particular photograph into evidence without proper foundation, specifically, exhibit 20 showing the bruise on Hart's leg. Exhibit 20 depicts a large bruise above the knee on someone's leg. The statement, "This bruise from you still hurts," has been superimposed across the lower portion of the picture (in white type on a black background). And, the exhibit also contains some printed notations above the picture, referencing "Snapchat" and "mail.google.com." At trial, Bernhagen objected to the offer of exhibit 20 on the basis of foundation. Hart then provided additional testimony establishing that she took the picture and when, that she saved the picture (in addition to sending it to Bernhagen via Snapchat), and that the picture accurately reflected the bruise on her leg from the bite inflicted by Bernhagen. The district court then received exhibit 20 over Bernhagen's renewed foundation objection.

On appeal, Bernhagen cites the best evidence rule and argues that the exhibit was a paper copy of a photograph and that the Snapchat file that was the source of the document was not offered. The best evidence rule, also known as the original document rule, as expressed in Neb. Rev. Stat. § 27-1002 (Reissue 2016), states that the original writing, recording, or photograph is required to prove the content of that writing, recording, or photograph. *Flodman v. Robinson*, 22 Neb. App. 943, 864 N.W.2d 716 (2015). When a duplicate writing or document is offered as evidence, the burden of raising an issue concerning the authenticity of the original writing or document, or showing circumstances of unfairness to prevent admissibility of a duplicate, is on the party opposing the duplicate's admission into evidence. *Id.* Bernhagen did not object at trial to the admission of the exhibit on the basis of its authenticity, and we find the record sufficiently establishes foundation for its admission. Hart was not asked about the writing superimposed on

the lower portion of the photograph, but she explained when she took the picture, the circumstances of her saving it in addition to sending it via Snapchat, and that it accurately reflected how her leg looked at the time.

Even if the district court's admission of exhibit 20 was in error, it was cumulative evidence. Erroneous admission of evidence does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020). Hart testified without objection about the bruise and how she received it, her sister confirmed seeing the bruise, and as discussed further below, other relevant and properly admitted evidence support the court's entry and affirmance of the protection order against Bernhagen. This assignment of error fails.

*Entry of Protection Order.*

Next, Bernhagen asserts that the district court erred in entering and affirming the protection order against him. He argues that there was insufficient evidence to support the grant of the order because Hart was not a credible witness and that her "true motives were proven to be revenge against Bernhagen." Brief for appellant at 12.

A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Hawkins v. Delgado*, 308 Neb. 301, 953 N.W.2d 765 (2021). A protection order is analogous to an injunction. *Id.* A party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief. *Id.*

Whether domestic abuse occurred is a threshold issue in determining whether an ex parte protection order should be affirmed; absent abuse as defined by Neb. Rev. Stat. § 42-903 (Cum. Supp. 2020), a protection order may not remain in effect. *Robert M. on behalf of Bella O. v. Danielle O.*, 303 Neb. 268, 928 N.W.2d 407 (2019). Section 42-903(1) defines "[a]buse" as the occurrence of one or more of the following acts "between family or household members":

> (a) Attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument;
> (b) Placing, by means of credible threat, another person in fear of bodily injury . . . or
> (c) Engaging in sexual contact or sexual penetration without consent as defined in [Neb. Rev. Stat. §] 28-318 [(Cum. Supp. 2020].

"Family or household members" include persons who have dated, who have resided together in the past, and who have children in common. § 42-903(3). In this case, Bernhagen and Hart had been involved in a romantic relationship, resided together during the first two of the incidents in question, and have a child in common.

In Hart's petition and affidavit, received in evidence, and in her testimony at the show cause hearing, she indicated that on April 25, 2021, Bernhagen threw her onto the couch, pushed his hands down her pants and attempted to initiate sexual intercourse, bit her leg, leaving a large bruise, threw her off the couch, and became infuriated and shook the parties' child before leaving the residence. Hart stated that on May 1, Bernhagen acted very aggressively toward two of the parties' dogs, again shook the parties' child, and when she refused his request for sexual contact,

dragged her by her hair to a particular location, pulled down her pants, and "forced himself on [her]." And, Hart indicated that on May 7 or 8, Bernhagen took firearms from the residence. She also testified that she is afraid Bernhagen will hurt her, that he has done so previously, and that she believes he will do so again.

In our de novo review, we find the evidence adduced by Hart supports a finding that Bernhagen caused Hart bodily injury, he placed Hart in fear of bodily harm by means of a credible threat, and he engaged in sexual contact or sexual penetration without her consent. In sum, Hart's evidence established by a preponderance of the evidence that the continuation of the ex parte domestic abuse protection order was proper.

On appeal, Bernhagen challenges Hart's credibility and motivations and, thus, her version of the events described in her petition and affidavit and testimony. He argues that Hart's testimony was inconsistent and that her claims were uncorroborated by other witnesses. He points to her testimony correcting the date for the April 2021 incident, the fact that she did not call the police or any other aid organization immediately following that incident, and did not go to "Voices of Hope" until during the first week of May. Bernhagen repeats his objections to the photo of the bruise on Hart's leg, which we have addressed above, and points to Hart's testimony that she had no other photographs, medical evidence, or first-hand witnesses to substantiate her claims. Although Hart did not present evidence in the forms referenced by Bernhagen, she testified consistently about all of the incidents set forth in her petition and affidavit.

This court does not ultimately decide issues of witness credibility. As noted above, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Robert M. on behalf of Bella O. v. Danielle O.*, 303 Neb. 268, 928 N.W.2d 407 (2019). Clearly, in deciding to continue the ex parte domestic abuse protection order, the district court found Hart to be a credible witness, and we do not second guess that determination.

Bernhagen also asserts that Hart's testimony should be discounted because her actions were inconsistent with her claims. Specifically, he points to Hart continuing to allow him to see their child after the April 2021 incident, albeit with supervision, the fact that Hart did not mention any violence by Bernhagen or danger to the parties' child when she saw Bernhagen's mother on April 25, 2021, and the fact that Hart never mentioned during her May 2 conversation with her friend that she had been physically hurt by Bernhagen. Clearly, the district court believed Hart's version of events and her explanations for the actions she took after the events.

Finally, Bernhagen contends that Hart was motivated by bad faith and revenge based on the call she made to an advocate for the National Guard, which occurred the day after Hart learned Bernhagen had spent the night with another woman, and testimony by other witnesses that Hart planned to create "consequences" if she ever found out that Bernhagen was cheating on her. In short, Bernhagen argues that the district court should have believed his assertions that Hart was using the issuance of the protection order against him to help create those "consequences" rather than as a means of protecting herself. This is simply another way of arguing that Hart was not a credible witness. Again, the district court heard and observed both the testimony of Hart and her witnesses and the testimony of Bernhagen and his witnesses, after which the court decided to continue the ex parte domestic abuse protection order. The court implicitly found Hart's testimony

to be more credible than Bernhagen's testimony. As discussed above, we accept the court's credibility determination.

There was sufficient evidence presented to support the continuation of the ex parte order. Accordingly, we affirm the court's continuation of the ex parte domestic abuse protection order.

*Attorney Fees.*

Finally, Bernhagen asserts that the district court erred in failing to award him attorney fees. He argues that he is entitled to attorney fees because the statements contained in Hart's petition and affidavit were false and her petition was brought in bad faith.

Generally, a party may recover attorney fees and expenses in a civil action only if provided for by statute or if a recognized and accepted uniform course of procedure allows the recovery of attorney fees. *Abbott v. City of Bellevue*, 310 Neb. 496, 967 N.W.2d 95 (2021). Customarily, attorney fees and costs are awarded only to prevailing parties or assessed against those who file frivolous suits. *Twin Towers Condo. Assn. v. Bel Fury Invest. Group*, 290 Neb. 329, 860 N.W.2d 147 (2015). A party is a prevailing party if it receives a judgment in its favor. *Id.*

Neb. Rev. Stat. § 25-824(2) (Reissue 2016) permits a court in any civil action to award "as part of its judgment and in addition to any other costs otherwise assessed reasonable attorney's fees and court costs against any attorney or party who has brought or defended a civil action that alleges a claim or defense which a court determines is frivolous or made in bad faith." A frivolous action is one in which a litigant asserts a legal position wholly without merit; that is, the position is without rational argument based on law and evidence to support the litigant's position. *City of Omaha v. Professional Firefighters Assn.*, 309 Neb. 918, 963 N.W.2d 1 (2021). The term "frivolous" connotes an improper motive or legal position so wholly without merit as to be ridiculous. *Id.*

Bernhagen also cites Neb. Rev. Stat. § 42-924.01 (Reissue 2016), which states in part:

> Fees to cover costs associated with the filing of a petition for a protection order or the issuance or service of a protection order seeking only the relief provided by the Protection from Domestic Abuse Act shall not be charged, except that a court may assess such fees and costs if the court finds, by clear and convincing evidence, that the statements contained in the petition were false and that the protection order was sought in bad faith.

In *Torres v. Morales*, 287 Neb. 587, 590, 843 N.W.2d 805, 809 (2014), the Nebraska Supreme Court defined bad faith in the context of § 42-924.01 as "'[d]ishonesty of belief or purpose.'" [Citation omitted.]

Bernhagen was not a prevailing party. Although there was some evidence presented at the contested protection order hearing to suggest that Hart may have had a motive other than, or in addition to, protection of herself and the parties' child in requesting a protection order, we have already determined that the evidence was sufficient to support the district court's entry of the domestic abuse protection order. Bernhagen has not shown that Hart's claim was frivolous or that the statements in her petition and affidavit were false or made in bad faith, and the court did not make any findings to that effect. See *Torres v. Morales, supra* (finding trial court was precluded from taxing costs to petitioner under § 42-924.01 absent findings that statements in petition and

accompanying affidavit were false or made in bad faith). For these reasons, Bernhagen's assignment of error fails.

## CONCLUSION

The district court did not err in admitting exhibit 20, determining that Hart was a victim of abuse within the meaning of § 42-903, or in in declining to award attorney fees to Bernhagen. Accordingly, we affirm.

AFFIRMED.